UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LATERAL RECOVERY LLC, BENCHMARK
BUILDERS, INC., FTE NETWORKS, INC.,
JUS-COM LLC and FOCUS WIRELESS, LLC,

                Plaintiffs,

     v.

TRENEN CAPITAL, INC., ELIYAHU
SANDERSON a/k/a ELI SANDERSON a/k/a
ELLIOT SANDERSON, and JOHN AND JANE
DOE INVESTORS,

                Defendants.

Civ. A. No.: 1:22-cv-10429

---

## COMPLAINT

Plaintiffs Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc. ("Benchmark"),

FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC

("Focus") (collectively "FTE") as and for their Complaint against Trenen Capital, Inc., ("Trenen

Capital" or the "MCA Company"), Eliyahu a/k/a Eli a/k/a Elliot Sanderson ("Sanderson")(Trenen

Capital and Sanderson collectively referred to as the "Principal"), and John and Jane Doe Investors

(the "Investors" together with the MCA Company and the Principal, collectively, the "Defendants"

or the "Enterprise"), state as follows:

## NATURE OF THE ACTION

1.      This is a RICO action against a merchant cash advance ("MCA") company that is

controlled and manipulated by its CEO and founder, Sanderson, to carry out a long-running

scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from FTE. Trenen

Capital entered the so-called "Merchant Agreement" with FTE pursuant to which lump sums were

purportedly paid to purchase FTE's future receipts at a discount and FTE agreed to repay the face value of its receipts through daily payments. While couched as the purchase and sale of future receipts, the agreements' terms, conditions, and actions of the Principal demonstrate that despite the form of the agreement (the "MCA Agreement"), no sale of receipts ever took place.

2.      Rather, the MCA Agreement was a loan for which Defendants negotiated and demanded repayment within a fixed time period—thirty-seven days. The payment term and interest charged are the metrics that the Defendants use to dictate the terms of the transactions. And under New York law, intent is the touchstone of whether a transaction is a loan, regardless of what the face of the contract purports it to be. Acknowledging the transactions as the true loan that it is, the loan charged an interest rate that exceeded **492%** multiple worlds and universes greater than the maximum 25% permitted under New York Penal Law.

3.      The Defendants are not alone.  Numerous other MCA companies use the same sham MCA agreements as a cover for their loansharking activities.

4.      For instance, the sham nature of Yellowstone Capital LLC's ("Yellowstone") form agreement recently drew scrutiny by New York's highest court. In answering certified questions from this Circuit concerning the procedural remedies available to redress Yellowstone's (also known as CMS) *unlawful* collection activities, a dissenting member of the Court questioned the underlying premise of the questions presented, i.,e., that the underlying judgment was presumed to be a lawful one:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and

more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]).

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting opinion).

5.      New York's highest court is not alone.  The Attorneys General of both New York and New Jersey each filed separate actions against others using the same sham form of MCA agreement, alleging that the transactions are disguised loans subject to this state's usury laws.  ***See Exs. 1-2.***

6.      The New Jersey Attorney General's Office ("NJ AG") and the Federal Trade Commission (the "FTC") each filed separate actions against Yellowstone and others, alleging that for years they have engaged in deceptive conduct to conceal the true nature of their transactions with merchants, including the very conduct underlying this action.  *See* **Exs. 2-3**, which factual allegations are incorporated herein by reference.

7.      Notably, at the time of the transactions with Defendants, FTE, a then publicly traded company, was being victimized by a CEO and CFO who were later indicted for fraud and embezzlement. The Defendants took advantage by effectively robbing FTE's shareholders and its creditors.

8.      It is against this backdrop that Plaintiffs file this Complaint.

## THE PARTIES

9.      FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  It was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

10.      At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

11.     At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

12.     At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

13.     At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

14.     Defendants have been operating Trenen Capital since at least 2013. *See* **Ex. 4**.

15.     Trenen Capital, Inc., is a limited liability company duly organized under the laws of New York with its principal place of business in New York at 680 Central Avenue, Suite 124, Cedarhurst, New York 11516.

16.     Sanderson is an individual who resides in Florida.

17.     Upon information and belief, each of the John and Jane Doe Investors is a citizen of New York.

## JURISDICTION

18.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961–68.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

20.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

4

## FACTUAL ALLEGATIONS

### A.    The Predatory MCA Industry

21.    As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for.  It's pretty much unregulated."[3]

22.    The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.[4]

23.    This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.* ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered.  Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] *Id.*

[3] *Id.*

[4] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

24.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The Trenen Capital Umbrella**

25.     Sanderson and Trenen Capital operate an illegal loansharking enterprise through various assumed names.

26.     Sanderson is listed as the Chief Executive Officer of Trenan Capital. *See* Ex. 4.

27.     Sanderson has signed affirmations in numerous actions filed by Trenen Capital with the Supreme Court of the State of New York, against various other businesses, seeking to collect on fraudulent confessions of judgments. *See* **Ex. 5**.

28.     In those affirmations, Sanderson holds himself out as having authority on behalf of Trenen Capital as "manager" of Trenen Capital. Notably, Sanderson identifies several different first names –Eli, Eliyahu, and Elliot are a few. *See* Ex. 5.

29.     Trenan Capital has filed several assumed name filings with the New York Department of State documenting that it operates under assumed names including but not limited to Third Point Capital, Altfi Capital, Newleaf Capital. *See* Ex. 4.

30.     Trenan Capital operates under assumed names for the common purpose of carrying on an ongoing unlawful enterprise.

31.     Linkages are between the various corporate entities are easily established.

32.     For instance, Altfi Capital Group LLC is a Florida limited liability company that also lists 680 Central Avenue, Suite 124, Cedarhurst, New York 11516 as its address, which is the company address for Trenen Capital. Elliot Sanderson has signed off as the authorized person in the filings made by Altfi Capital Group LLC with the Florida Secretary of State. *See* **Ex. 6**.

**C.     The MCA Agreement is Substantively and Procedurally Unconscionable.**

33.     The MCA Agreement entered into by the Plaintiffs, is an unconscionable contract of adhesion that was not negotiated at arms-length.

34.     Instead, it contains one-sided terms that prey upon the desperation of the small businesses and their individual owners and help conceal the fact that the transactions, including this one involving FTE, are really loans.

35.     Among these one-sided terms, the MCA Agreement includes: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) a right of access to the merchant's premises and operations in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney with full authority "to take any action or execute any instrument or document or to bring any action necessary to settle all obligations due to Merchant from any Processor, or in the case of a breach of this agreement by Merchant or the occurrence of an Event of Default…"

36.     The MCA Agreement is also unconscionable because it contains numerous knowingly false statements.  Among these knowingly false statements are that: (1) the transaction

is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant Underwriting Fee and Origination Fee.

37.     The MCA Agreement is also unconscionable because it is designed to fail.  Among other things, the MCA Agreement is designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

38.     The MCA Agreement also contains numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreement (1) requires the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerates the entire debt upon an Event of Default, and (3) requires the merchant to turn over 100% of all of its receivables if it misses fixed daily payments.

**D**.     **The Intent of the Defendants is to Issue Fixed-Term Loans Using a Sham Reconciliation Provisions to Disguise the Loans.**

39.     In order to evade state usury laws, the Defendants include a sham reconciliation provision to give the appearance that the loans do not have a definite term.

40.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

41.     For example, if a MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

42.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased. By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

43.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

44.     In fact, the daily payment is calculated by dividing the payback amount by the intended duration of the loan.

45.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**G.     The Enterprise Intentionally Disguised the True Nature of the Transaction.**

46.     Despite the documented form, the transaction is, in economic reality, a loan that is absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     The Enterprise assumed no risk of loss if an account debtor failed to pay an allegedly purchased receivable because the daily payments would be deducted from the next merchant that paid a merchant.

(i)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(j)     The Enterprise required that the merchant obtain business interruption insurance and name the Enterprise as both an additional insured and a loss payee under the policy.

(k)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

(l)     Bankruptcy was an event of default under the agreements.

(m)     The Enterprise required that the merchant's owners guarantee the representations, covenants, and warranties under the agreements and the owners guaranteed obligations were triggered upon the filing of bankruptcy.

47.     But most important is intent: New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Defendants, which determine the payback based on the number of days in which the Defendants want to be paid back.  The number of days for payback has no relation to the timing of the percentage of receivables that the Defendants and the MCA Company was purporting to purchase.

48.     Instead of providing reconciliation, troubled merchants, like FTE here, are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest—resulting in interest rates into the many thousands percent range.

49.     Upon information and belief, the Defendants systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

50.     The Defendants also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

51.     The Defendants also show in their underwriting practices that their agreements are loans.  Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.  When underwriting new transactions, the Defendants do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all— yet they still charge hundreds of thousands for their so-called underwriting.

52.     When the Defendants go to collect upon their agreements, they treat them just like loans. For example, they require that the merchant make fixed daily payments under their agreements and grant security interests to the MCA Company in substantially all of the merchant's assets to ensure that the daily payments are made.

53.     They also require that the merchants execute confessions of judgment that the MCA Company could file if the merchant fails to make as few as two daily payments under their agreements.  In other words, the Defendants structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

54.     The Defendants also engage in other unscrupulous behavior toward their merchants.  Among other things, the Defendants often fail to advance merchants the full amounts provided for in their agreements, and charge exorbitant fees for services that are never provided and costs that are never incurred.

## THE UNDERLYING FTE TRANSACTION

**A.     FTE Networks.**

55.     At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network

infrastructures and buildings. The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies. The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation. Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

56.     Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

57.     Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

58.     Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.     Lateral**

59.     On or about October 28, 2016, Lateral, as administrative agent for the lenders, entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

60.     FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

61.     Lateral properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

62.     In or around July 2019, FTE defaulted under the terms of the Credit Agreement, due to increasing financial stress incurred through Defendants' MCA agreements' onerous and usurious terms. Thus, like FTE, Lateral's cash flow was materially impacted by Defendants' usurious business practices.

63.     Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turnover its interest in the collateral including, but not limited to, the claims asserted in this action.

## C.     FTE Networks and the MCA Industry

64.     In 2018, prior to defaulting under the Credit Agreement, FTE needed additional financing.  To procure that financing, FTE turned to the merchant cash advance industry, including the Defendants, falling victim to the tactics described above.

## D.     The Loan Transaction.

65.     FTE entered into a loan transaction with the Defendants ("Loan Transaction") on December 14, 2018.

66.     Specifically, FTE executed that certain agreement entitled Receivables Sales Agreement (the "**Loan Agreement**"), that certain agreement document entitled Security Agreement  (the "**Security Agreement**"), that certain addendum entitled Fee Structure (the "**Fee Structure Addendum**"), that certain Affidavit of Confession of Judgment ("**Affidavit of**

**Confession of Judgment**"), and that certain Balance Transfer Form ("**Balance Transfer**") (collectively the Loan Agreement, Security Agreement, Fee Structure Addendum, Confession of Judgment, Balance Transfer, the "**First Loan Documents**"). *See* **Ex. 7**.

67.    On the face of the Loan Agreement, Trenen Capital was to advance $250,000, which was disguised as the "Purchase Price."

68.    The amount to be repaid was $374,750, which was disguised as the "Purchased Amount."

69.    The loan was to be repaid through fixed daily ACH withdrawals in the amount of $12,492 (a "Daily Amount"), which was disguised as a purported good-faith estimate of FTE's daily receivables. The specific percentage was 15% ("Specific Percentage"). The Daily Payment was a sham and was unilaterally dictated by Trenen Capital.

70.    The negotiated term of the loan was approximately 37 business days. On its face, the loan had an interest rate in excess of 492%.

71.    In addition, FTE was required to pay $19,995 as an Underwriting Fee, and $9,995 as an Origination Fee, as further consideration for making the loan, along with other fees itemized in the Fee Structure Addendum.

72.    On December 14, 2018, a Balance Transfer Form was also executed between FTE and Trenen Capital.

73.    The form specifically states:  FTE "agrees to transfer the remaining RTR balance due in the amount of $39,093.00 on the TC agreement #1 dated and signed 10/23/2018. The RTR Balance has been added to the new 'TC' agreement dated and signed on 12/14/2018."

74.     Therefore, in accordance with this balance transfer, FTE did not receive the Purchase Price of $250,000. Instead, the Purchase price of the Loan Transaction was deducted by the balance ($39,093.00) due from a prior usurious loan with Trenen Capital.

75.     Plaintiff has suffered significant damages as Plaintiff was obligated to repay funds well above the amounts advanced by Defendants.

**E.      The Enterprise Operates by using a Form MCA agreement.**

76.     The Loan Transaction and the Loan Documents evidence a primary form template (the "Trenen Capital Form") used by the Enterprise.

77.     While there are differences within a specific agreement for the loans entered into by the Enterprise, such as the date, the funding entity, and the amounts funded, these details are not material as to whether an MCA agreement is actually a loan. As highlighted below, the Trenen Capital Form evidences factors that are indicative of loans.

78.     In *Lateral Recovery, LLC v. Capital Merchant Services LLC,* 21-cv-9336 (LJL) (Sept. 30, 2022), a recent decision issued by the Southern District of New York, the Court underwent a lengthy analysis in assessing similar form agreements and found that several provisions demonstrate that these "merchant cash agreements" were truly indicative of loans. *Id*. The Court noted, amongst other things, that "the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances.'" *Id*. (citing *Fleetwood Services, LLC v. Ram Capital Funding LLC*, 2022 WL 1997207, at *9 (S.D.N.Y June 6, 2022)). Moreover, the Court explained: "Recently, Federal Courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner and the conclusions they have reached are compelling." *Id*.

16

L.      **The Trenen Capital Form.**

79.      The Trenen Capital Form demonstrates that the terms of the template agreement used by the Enterprise are indicative of loan terms.

80.      For example, the Adjustment to Specific Amount provision, the Events of Default provision, and the Purchaser's Remedies on Default provision, demonstrate the document was in fact intended to memorialize a loan agreement irrespective of how it is labeled, and that Trenan Capital is guaranteed absolute right of repayment in all circumstances.

81.      The "Adjustment to Specific Amount" provision of the Trenen Capital Form represents an illusory reconciliation provision. Specifically, the provision states:

> Adjustment to Specific Amount. The Specific Amount is intended to represent, on a daily basis, the Specified Percentage of Merchant's receipts. Merchant represents that the Specific Amount (on a daily basis) in not less than the average Receipts times the Specific Percentage. Purchaser may, but is not required to, adjust the Specific Amount so that the amount received by Purchaser more closely represents the Specified Percentage of actual Receipts. Merchant may request, in writing and no more often than once per month, Purchaser to reconcile and adjust the Specific Amount so that the amount received by Purchaser more closely represents the Specified Percentage. Upon such request from Merchant, Purchaser may request further information, bank statements, financial statements, tax returns and authorizations which, in Purchaser's sole judgment, are necessary to verify Merchant's information. Purchaser shall not be required to adjust the Specific Amount, but may do so without notice to the Merchant.

82.      Notably, this provision makes clear that the merchant would need to request a reconciliation in order for the "Specific Amount" to be adjusted in the future. In the scenario where a merchant is unable to generate or collect "receivables" to pay the Specific Amount, the reconciliation provision proves meaningless as any reconciliation would occur after-the-fact, and can only be requested once per month.

83.      In fact, the circumstances that would permit Trenen Capital (as a lender) to call an Event of Default and to require that the merchant pay 100% of the uncollected Purchased Amount

will have already taken place long before any reconciliation could take place or requested by a merchant.

84.     Thus, the reconciliation provision is illusory in practice.

85.     The Events of Default provision states in relevant part:

> The occurrence of any of the following is an 'Event of Default' under this Agreement and constitute a violation of a substantial obligation of the Agreement:
> ….
> 1) Merchant or Guarantor violating any term or covenant in this Agreement;
> …
> 4) The failure of an ACH Transfer or other attempted debit of funds eight or more times during the term of this Agreement or while any portion of the Purchased Amount is outstanding;
> …
> 5) Default by merchant under a substantially similar receivables sales agreement made with Purchaser or any other agreement with Purchaser…

86.     This provision demonstrates that if a merchant fails to make the Daily Amount payment eight times, the merchant is considered in default. Irrespective of the merchant's ability to pay the Daily Amount, it would still be liable to Trenen Capital to repay the full Purchased Amount.

87.     Also included as an event of default is any default by the merchant "under a substantially similar receivables sales agreement." This further evidences and substantiates the Defendants' Enterprise operation, and the provision seeks to add additional protections to ensure the Defendants would be made whole for a merchant's default under any "receivables sales agreement" entered into with Defendants.

88.     The Purchaser's Remedies on Default provision states in relevant part:

> Upon the occurrence of an event of default, Purchaser may exercise one or more of the following remedies. Purchaser's remedies are cumulative and the use of any remedy by Purchaser shall not bar the use of any other remedy.

18

1) The full Outstanding Balance under the Agreement, plus all costs and fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.
…
3) Merchant and Guarantor hereby authorize Purchaser to execute in the name of the Merchant and Guarantor a Confession of Judgment in favor of Purchase in the amount of the Outstanding Balance on the date of the Default Date, plus fees, legal fees, and interest from the Default Date. Upon an Event of Default, Purchaser may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

4) If merchant has executed a confession of judgment in relation to this Agreement or in connection with another similar agreement with Purchaser, either prior to or after the execution of this Agreement, Purchaser may file[] the confession of judgment and obtain a judgment for all sums due under this agreement and any other agreement wherein Merchant is in default.

5) Purchaser may enforce its security interest in the Collateral.

6) The entire Purchased Amount less amounts collected and all fees (including attorney's fees as liquidated herein) shall become immediately payable to Purchase[r] from Merchant.
…

89.    As demonstrated above, in the scenario where a merchant fails to make the Daily Amount eight or more times (or defaults on a different sales receivables agreement with Defendants), it is considered in default and therefore the Purchaser's Remedies on Default provision would further accelerate the full Purchased Amount due and owing, so that Trenen Capital can be made whole.

90.    Specifically, the Purchaser's Remedies on Default provision states that "The full Outstanding Balance under the Agreement, plus all costs and fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately."

91.    Similarly, if there are eight or more ACH transactions attempted that are rejected by the merchant's bank in any given calendar month (irrespective if the "Purchased Amount" can

be paid), the merchant is held to be in default and Trenen Capital is entitled to full payment under the acceleration clause of the Purchaser's Remedies on Default provision.

92.     The Purchaser's Remedies on Default provision evidences that Trenen Capital (as a lender) is made whole and is entitled to repayment under all circumstances if any Daily Amount payment is missed or unable to be made by the merchant. There is no transfer of risk.

93.     Stated differently, irrespective of any event of default, Purchaser's Remedies on Default (as a lender) would be entitled to absolute repayment.

94.     The effect of the aforementioned provisions is to further confirm that the Trenan Capital Form is a template agreement that evidences a loan.

95.     The provisions as a whole in the Trenen Capital Form eliminate any risk on the part of Trenen Capital and gives it full and absolute repayment rights. It even gives them full repayment for any other loan (aka "receivables sales agreement") that the merchant may have entered into with Trenen Capital.

96.     The label placed on the Trenen Capital Form that it is an "Receivables Sales Agreement" between a merchant and a purchaser is simply an illusory label.

97.     The provisions confirm that a merchant is obligated to pay a fixed amount on a daily basis. And if it fails to do so, just twice, it is considered in default and Trenen Capital (as a lender) has access to all rights and remedies in the Trenen Capital Form agreement.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

98.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

A.     **The Unlawful Activity.**

99.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

100.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

101.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the 'roughing up tactics' used by usurious lenders to enforce payment."

102.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

103.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

104.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

105.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

106.     Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

107.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

108.     Defendants issue usurious loans under the guise of an MCA agreement to borrowers facing financial duress and who lack sophistication of experienced borrowers and have little familiarity with the MCA industry.

109.     While the MCA agreement here purports to be a purchase of identifiable receivables, their terms actually involve Defendants' purchase of "Merchant's future accounts receivable , future receivables and rights to receive payment and other compensation from Merchant's customers, clients, third party payors, and other obligors (said amounts being collectively "Receipts")."

110.     While the MCA agreement purports to allow for reconciliation, its actual terms reveal this to be illusory as borrowers are limited to one (1) reconciliation request per calendar month, and since the loan here had a payment term of approximately one month, there is no actual promise to reconcile.

111.     Defendants structure the MCA agreements to ensure absolute repayment through the aforementioned sham reconciliation provision, which leaves the loan's term definite as a matter of mathematics, and forcing the borrower's principals to personally guaranty the Merchant's entire obligations in the event the Merchant defaults.

**B.     Culpable Person.**

112.     Sanderson is classified as a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is either an individual, corporation or limited liability company capable of holding a legal interest in property.

113.    At all relevant times, Sanderson was, and is, a person that exists separate and distinct from the Enterprise, described below.

114.    Sanderson is the CEO, and authorized representative of Trenen Capital.

115.    Sandersons signs affidavits in support of Trenen Capital's improper Confessions of Judgment Actions filed with the New York Supreme Court and further represents himself as the manager. *See* Ex. 5.

116.    During the relevant time period, Sanderson controlled transactions within the Enterprise and was an authorized representative of Trenen Capital

117.    Through his operation of Trenen Capital, the RICO Person solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.      The Enterprise.**

118.    Trenen Capital, Sanderson, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

119.    Trenen Capital, Sanderson, and the John and Jane Doe Investors are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

120.    Since at least 2013 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating,

underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

121.    Over this period the Enterprise individual members would assume various trade names to do business under. This was intentionally done as part of the Enterprise's hierarchy to ensure that corporate members of the Enterprise were as insulated as possible from liability under the usurious agreements by creating plausible deniability as each specific member's liability and obligations under each specific agreement.

122.    Indeed, through the use of various alter-ego identities for the individual members of the Enterprise, Defendants intend to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Enterprise is automatically withdrawing monies from borrowers' accounts.

123.    Upon information and belief, the Enterprise's use of alter-ego names for its members was orchestrated by Sanderson, as the common thread between all these members and their alter-egos is that they were ultimately controlled and for the benefit of the Defendants.

124.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

125.    Since at least 2013 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

126.     The Enterprise's conduct further constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.     The Roles of the RICO Person in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

127.     The RICO Person, Sanderson, has organized himself and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.     Eliyahu Sanderson.**

128.     Sanderson is responsible for the day-to-day operations of the Enterprise, primarily through Trenen Capital, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

129.     In his capacity as a member of the Enterprise, Sanderson is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon

its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

130.    Sanderson has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

131.    Sanderson has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to others within the Enterprise.

**ii.    Trenen Capital.**

132.    Trenen Capital is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

133.    Through its assumed names, Trenen Capital participates in and furthers the interests of the Enterprise by (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its assumed names to further collect upon the unlawful debt.

134.    In this case, Trenen Capital, through Sanderson, knowingly and intentionally: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the

agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### iii.      The John and Jane Doe Investors

135.   The John and Jane Doe Investors (the "Investors") are a group of individual investors who maintain separate officers, books, records, and bank accounts independent of the Enterprise members.

136.   Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

137.   The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.      Interstate Commerce

138.   The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

139.   Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

140.     In the present case, all communications between the members of the Enterprise, FTE were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advances under the agreements and collect the Daily Payments via interstate electronic ACH debits.

141.     In addition, at the direction of Defendants, the MCA Agreement was executed in Florida, and original copies of the agreement and the applicable Confession Affidavits were sent from Florida to the Enterprise, through Defendants, at their offices in New York via Federal Express using labels prepared by Defendants.

**F.     Injury and Causation.**

142.     Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $193,833, the amount of the unlawful debt collected by the Enterprise form FTE.

143.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

144.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

145.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

146.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

28

147.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

148.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

149.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

150.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

151.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

152.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing, but no less than $193,833.

153.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

154.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

155.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

a) Declaring the Plaintiffs' agreements with Defendants to be usurious loans in violation of New York Penal Law §190.40 and thus void and unenforceable;

b) Against Defendants on account of the First Cause of Action, in an amount to be determined at trial but no event less than $193,833, plus treble damages and attorneys' fees;

c) Against and the Defendants on the Second Cause of Action in an amount to be determined at trial but no event less than $193,833, plus treble damages and attorneys' fees;

d) Any further relief deemed appropriate by the Court.

Dated:  December 9, 2022

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorney for Plaintiffs*

31